## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| BRENDA WILSON, as mother and next friend of TENIESHA ADAMS, a minor, ) ) ) | |
| Plaintiff, ) | |
| vs. ) | CIVIL NO. 05-297-GPM |
| ) | |
| CAHOKIA SCHOOL DISTRICT # 187, ) LELA PRINCE, DWAYNE COTTON, ) MEARL JUSTUS, and COUNTY OF ) ST. CLAIR, ILLINOIS, ) ) | |
| Defendants. ) | |

# MEMORANDUM AND ORDER

**MURPHY, Chief District Judge:**

This matter is before the Court on the motion for summary judgment brought by Defendants Mearl Justus and the County of St. Clair, Illinois ("St. Clair County") (Doc. 63), the motion for summary judgment brought by Defendants Cahokia School District # 187 ("Cahokia"), Lela Prince, and Dwayne Cotton (Doc. 65), and the motions for reconsideration (Doc. 70, Doc. 71) brought by Plaintiff Teniesha Adams, by and through Brenda Wilson as her mother and next friend. For the following reasons the motions for summary judgment are **GRANTED** and the motions for reconsideration are **DENIED**.

### INTRODUCTION

This case arises from an incident that occurred on April 27, 2004, in which Teniesha Adams, a sixth-grade student at Wirth/Parks Middle School in Cahokia, Illinois, allegedly was sexually assaulted on the school's premises after regular classroom hours by Craig Nichols, a classmate who was serving a period of after-school detention at the school on that afternoon. *See* Doc. 1 at

3-4 ¶¶ 2-5; Doc. 68, Ex. A at 31-32; *Id*., Ex. B at 37; *Id*., Ex. G at 24.  Adams immediately reported the incident to Lela Prince, a principal at the school.  *See* Doc. 66, Ex. O; Doc. 68, Ex. A at 31-32; *Id*., Ex. B at 39-40.  Prince notified Dwayne Cotton, the school resource officer charged with investigating disciplinary infractions at the school and a deputy of the St. Clair County Sheriff's Department, about the incident and informed Adams's mother, Brenda Wilson, that there was likely to be an investigation of the incident by Cotton.  *See* Doc. 64, Ex. B at 25, 37; Doc. 66, Ex. K; *Id*., Ex. L; Doc. 68, Ex. B at 53; *Id*., Ex. C at 113-14.  Wilson in turn informed Prince that she did not wish for her daughter to be interviewed by Cotton about the alleged attack without Wilson's knowledge.  *See* Doc. 68, Ex. C at 114-15.  The following morning, April 28, 2004, Cotton called Adams out of class and escorted her to his office, where he interviewed her about the alleged attack the previous day.  *See* Doc. 64, Ex. A at 77; *Id*., Ex. B at 107, 120.  During the interview Wilson spoke with Cotton by telephone and asked him to terminate the interview and send Adams home. *See* Doc. 64, Ex. B at 103-04; Doc. 68, Ex. C at 128.  Cotton declined to end the interview but invited Wilson to retrieve her daughter from the school.  *See* Doc. 64, Ex. B at 104.  In the course of the interview, Adams consented to be examined by a female school employee for scratches on her back and arms caused by the alleged assault.  *See* Doc. 64, Ex. A at 82, 87; Doc. 66, Ex. N.  At the conclusion of the interview, Cotton escorted Adams back to class.  *See* Doc. 64, Ex. A at 87-88.

Adams by Wilson as her next friend subsequently filed this action in connection with the alleged assault and the investigation thereof.  In her complaint Adams asserted claims pursuant to 42 U.S.C. § 1983, alleging deprivations of her constitutional rights by persons acting under color of state law, together with claims under Illinois state law.  Specifically, Adams alleged violation of

her Fourteenth Amendment substantive due process rights by Prince and Cahokia, which operates Wirth/Parks Middle School, violation of her Fourth Amendment right to be free of unlawful searches and seizures by Prince, Cotton, Cahokia, and Mearl Justus, the Sheriff of St. Clair County, and conspiracy to violate her Fourth Amendment rights by Prince and Cotton.  Adams also alleged claims under Illinois law for false imprisonment and intentional infliction of emotional distress against Prince, Cotton, Cahokia, Justus, and St. Clair County.  By Order entered September 29, 2005, the Court dismissed with prejudice Adams's claims of false imprisonment and intentional infliction of emotional distress for failure to state a claim upon which relief can be granted.  The Court also dismissed Adams's section 1983 claims against Prince and Cotton in their official capacities.

Prince, Cotton, and Cahokia have moved for summary judgment as to Adams's claims brought pursuant to 42 U.S.C. § 1983 for violations of her rights under the Fourteenth Amendment and the Fourth Amendment.  Justus and St. Clair County have brought a separate request for summary judgment as to Adams's Fourth Amendment claims.  Adams has responded to the summary judgment motions and has moved in turn for reconsideration of the Court's dismissal of her false imprisonment claims.  Having reviewed all of the submissions of the parties and conducted a hearing on the subject motions, the Court now is prepared to rule.

## DISCUSSION

**A.      Summary Judgment**

**1.      Legal Standard**

Summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). In considering a summary judgment motion, a court must review the entire record and draw all reasonable inferences in the light most favorable to the non-moving party. *See NLFC, Inc. v. Devcom Mid-America, Inc.*, 45 F.3d 231, 234 (7th Cir. 1995); *Enquip, Inc. v. Smith-McDonald Corp.*, 655 F.2d 115, 118 (7th Cir. 1981). On summary judgment a court may not make credibility determinations or weigh the evidence, because these are tasks for a factfinder. *See Betaco, Inc. v. Cessna Aircraft Co.*, 32 F.3d 1126, 1138 (7th Cir. 1994); *Sarsha v. Sears, Roebuck & Co.*, 3 F.3d 1035, 1041 (7th Cir. 1993). In evaluating a motion for summary judgment, "[t]he court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).

### 2.    Fourteenth Amendment Claims

The Fourteenth Amendment provides, in relevant part, that "[n]o State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Adams alleges that Prince and Cahokia, acting under color of state law, violated her due process rights by failing to protect her from an assault by Craig Nichols. In evaluating this claim on summary judgment, the Court must proceed from the assumption that the state has no constitutional duty to protect its citizens from assaults by fellow citizens. "The Constitution is a charter of negative liberties; it tells the state to let people alone; it does not require the federal government or the state to provide services, even so elementary a service as maintaining law and order." *Bowers v. DeVito*, 686 F.2d 616, 618 (7th Cir. 1982). *Cf. Olmstead v. United States*, 277

U.S. 438, 478 (1928) (Brandeis, J., dissenting) ("The makers of our Constitution . . . . conferred, as against the government, the right to be let alone – the most comprehensive of rights and the right most valued by civilized men.").  "The men who wrote the Bill of Rights were not concerned that government might do too little for the people but that it might do too much to them."  *Jackson v. City of Joliet*, 715 F.2d 1200, 1203 (7th Cir. 1983).

The purpose of the Constitution, then, is to shield citizens from the state, not from their fellow citizens.  Thus, "there is no constitutional right to be protected by the state against being murdered by criminals or madmen," *Bowers*, 686 F.2d at 618, or any of the host of lesser insults citizens may visit on one another.  For example, in *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989), the Court held that employees of a state family services agency owed a little boy no constitutional duty to protect him from harm while in the custody of an abusive father:

> [N]othing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors.  The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security.  It forbids the State itself to deprive individuals of life, liberty, or property without "due process of law," but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means . . . . Its purpose [is] to protect the people from the State, not to ensure that the State protected them from each other.  The Framers were content to leave the extent of governmental obligation in the latter area to the democratic political processes.

*Id*. at 195-96.  Accordingly, the Court held that the state officers were not liable under 42 U.S.C. § 1983 for the massive brain damage the boy's father eventually inflicted on him.  *See* 489 U.S. at 193, 202-03.

There is, of course, an exception to the rule that the state generally owes no constitutional duty of protection for cases in which the state has assumed custody over an individual and, by reason

of the custody, has deprived the individual of the ability to care for himself or herself.  *See, e.g.,*
*Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244-45 (1983) (holding that due process requires
the state to provide medical care to suspects in police custody who have been injured while being
apprehended by the police); *Youngberg v. Romeo*, 457 U.S. 307, 317 (1982) ("When a person is
institutionalized . . . and wholly dependent on the State . . . a duty to provide certain services and
care does exist."); *Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976) (holding that, because a prison
inmate is unable "by reason of the deprivation of his liberty [to] care for himself, " it is only "just
" that the state be required to treat the inmate's serious medical needs:  "An inmate must rely on
prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be
met.").  However, although the Supreme Court of the United States has not spoken directly to the
issue, the Court has hinted that, notwithstanding mandatory school-attendance laws, public schools
do not have a custodial relationship with students such as to give rise to a constitutional duty to
protect students from injury by third parties.  *See Vernonia Sch. Dist. 47J v. Acton*, 515 U.S.
646, 655 (1995) (citing *DeShaney*, 489 U.S. at 200) ("[W]e do not, of course, suggest that public
schools as a general matter have such a degree of control over children as to give rise to a
constitutional 'duty to protect[.]'").

The United States Court of Appeals for the Seventh Circuit, like the majority of lower federal
courts, holds that schools do not owe a constitutional duty to protect students.  In *J.O. v. Alton
Community Unit School District 11*, 909 F.2d 267 (7th Cir. 1990), the court ruled that public school
officials were not under a duty to protect students from sexual abuse by a teacher, reasoning that
"compulsory school attendance [does not] make[ ] a child unable to care for basic human
needs . . . . Schoolchildren are not like mental patients and prisoners such that the state has an

affirmative duty to protect them." *Id*. at 272-73.  The *J.O.* court concluded that, because parents still maintain primary responsibility for their children, compulsory school attendance does not create the sort of special relationship that would trigger heightened protection as a matter of due process. *See id*. at 272.[1]  The Seventh Circuit's position that school officials owe no constitutional duty to protect students plainly is the majority view in the federal courts.  *See, e.g., Wyke v. Polk County Sch. Bd.*, 129 F.3d 560, 569 (11th Cir. 1997); *Doe v. Hillsboro Indep. Sch. Dist.*, 113 F.3d 1412, 1415 (5th Cir. 1997); *Doe v. Claiborne County*, 103 F.3d 495, 510 (6th Cir. 1996); *Dorothy J. v. Little Rock Sch. Dist.*, 7 F.3d 729, 732 (8th Cir. 1993); *Maldonado v. Josey*, 975 F.2d 727, 731-33 (10th Cir. 1992); *D.R. v. Middle Bucks Area Vocational Technical Sch.*, 972 F.2d 1364, 1372 (3d Cir. 1992); *Plumeau v. Yamhill County Sch. Dist.*, 907 F. Supp. 1423, 1442-43 (D. Or. 1995); *Doe v. Douglas County Sch. Dist. RE-1*, 770 F. Supp. 591, 593 (D. Colo. 1991).

In this case, as discussed, Craig Nichols's alleged assault on Adams occurred outside regular school hours when Adams was under no compulsion to be on the school's premises, so that any constitutional duty of protection Prince and Cahokia may have owed her likely terminated at the end of the regular school day.  *See Leffall v. Dallas Indep. Sch. Dist.*, 28 F.3d 521, 529 (5th Cir. 1994) (in a suit against school officials arising from an incident in which a student was shot to death during a school dance, holding that the school owed no constitutional duty to protect students during

---

1.     The *J.O.* court acknowledged in dictum that, under the familiar doctrine of *Monell v. Department of Social Services*, 436 U.S. 658 (1978), a municipal entity could be liable under 42 U.S.C. § 1983 if abuse of children by their teachers were the result of an official school policy.  *See* 909 F.2d at 271-72 & n.4.  *See also Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720, 724-25 (3d Cir. 1989) (citing *Monell*, 436 U.S. at 690-91) (a school official can be liable under section 1983 if he or she "maintains a practice, custom, or policy of reckless indifference to instances of known or suspected sexual abuse of students by teachers, in concealing complaints of abuse, and in discouraging students' complaints about such conduct.").  The Court will address Adams's municipal-liability claim under the Fourteenth Amendment in a bit more detail *infra*.

activities held outside the hours students are required to attend school); *Brum v. Town of Dartmouth*, 704 N.E.2d 1147, 1160 (Mass. 1999) (a school owed no duty to protect a student who was older than the age for mandatory school attendance). Although Adams attempts to show that Prince and Cahokia assumed a duty to protect her by placing her in a position of danger, these efforts are not convincing. In *DeShaney*, of course, the Court acknowledged that the state may assume a constitutional duty to protect an individual from harm when the state takes actions that render the individual "more vulnerable" to such harm. 489 U.S. at 201. Adams tries to show that school officials placed her in the path of harm because Janice Brown, the teacher supervising Nichols's after-school detention on the day of the alleged assault, sent Nichols to look for Adams in the school building and may have violated a school regulation mandating close supervision of students in detention. *See* Doc. 68, Ex. H at 28; *Id.*, Ex. L. Drawing all inferences in Adams's favor as the Court must on summary judgment, her evidence clearly does not satisfy the stringent burden of proof she must shoulder to establish liability under 42 U.S.C. § 1983.[2]

Although in *DeShaney* the Court recognized that the state may assume a constitutional duty of protection where it places an individual in danger, the *DeShaney* Court recognized also that "the Due Process Clause of the Fourteenth Amendment . . . does not transform every tort committed by a state actor into a constitutional violation." 489 U.S. at 202. It is well settled that, to establish a violation of 42 U.S.C. § 1983, more than simple negligence is required. *See Davidson v. Cannon*, 474 U.S. 344, 348 (1986) ("[T]he protections of the Due Process Clause, whether procedural or substantive, are just not triggered by lack of due care by prison officials."); *Galdikas v. Fagan*, 342

---

2.   Also, it should be noted, the record shows that after Brown sent Nichols to look for Adams, Nichols returned to the detention room within two or three minutes; the alleged assault occurred later, when Brown gave Nichols permission to go to his locker. *See* Doc. 78, Ex. B.

F.3d 684, 690 (7ᵗʰ Cir. 2003) (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998)) ("[L]iability for negligently inflicted harm is categorically beneath the threshold of constitutional due process."); *State Bank of St. Charles v. Camic*, 712 F.2d 1140, 1147-48 (7ᵗʰ Cir. 1983) (the suicide of a pretrial detainee resulting from "simple negligence" on the part of prison officials does not amount to a violation of due process). This is because it is not the office of section 1983 to federalize the entire field of state tort law. *See Daniels v. Williams*, 474 U.S. 327, 332 (1986) (quoting *Paul v. Davis*, 424 U.S. 693, 701 (1976)) ("We . . . reject[ ] reasoning that . . . would make of the Fourteenth Amendment a font of tort law to be superimposed upon whatever systems may already be administered by the States[.]").

As a rule, to establish a violation of substantive due process, a plaintiff must show that governmental conduct "shocks the conscience." *See Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 126 (1992) (holding that, to establish a claim for a violation of substantive due process, a plaintiff must show "arbitrary government action that . . . shock[s] the conscience . . . of federal judges."); *Rochin v. California*, 342 U.S. 165, 172 (1952) (first enunciating the "shocks the conscience" standard in barring the admission of evidence at a criminal trial that had been obtained by forcibly subjecting the defendant to a stomach pump). Governmental conduct "shocks the conscience" when it "constitute[s] a denial of fundamental fairness, shocking to the universal sense of justice." *Armstrong v. Squadrito*, 152 F.3d 564, 570 (7ᵗʰ Cir. 1998). "[O]nly the most egregious official conduct . . . is arbitrary in the constitutional sense" and the official conduct must be "unjustifiable by *any* governmental interest." *Dunn v. Fairfield Cmty. High Sch. Dist. No. 225*, 158 F.3d 962, 965 (7ᵗʰ Cir. 1998) (quoting *Lewis*, 523 U.S. at 846, 849) (emphasis in original). *See also Remer v. Burlington Area Sch. Dist.*, 286 F.3d 1007, 1013 (7ᵗʰ Cir. 2002). The Court notes that

several sister courts have applied the shocks-the-conscience standard in suits regarding alleged violations by school officials of the substantive due process rights of students. *See, e.g., Hasenfus v. LaJeunesse*, 175 F.3d 68, 72 (1st Cir. 1999) (in a suit arising out of a gym teacher's failure, despite a rash of suicides at a school, to supervise a despondent student who attempted suicide, holding that, to be actionable, a school's dereliction of duty would have to approximate conduct "so extreme as to . . . shock the conscience."); *Canty v. Old Rochester Reg'l Sch. Dist.*, 54 F. Supp. 2d 66, 72 (D. Mass. 1999) (applying the shocks-the-conscience standard to a student's allegation that school officials required her to attend class under the supervision of a teacher who had sexually assaulted her).

At an absolute minimum, to be actionable under 42 U.S.C. § 1983 governmental conduct must amount to deliberate indifference, a standard that, as discussed supra at footnote 1, dovetails with the familiar standard for municipal liability under *Monell*. *See Sivard v. Pulaski County*, 959 F.2d 662, 669 (7th Cir. 1992) ("A § 1983 claim must be based on deliberate indifference, not on mere inadvertence."). "In this Circuit, deliberate indifference 'is merely a synonym for intentional or criminally reckless conduct.'" *Thomas v. Walton*, No. CIV. 02-969-GPM, 2006 WL 3360516, at *4 (S.D. Ill. Sept. 19, 2006) (quoting *Salazar v. City of Chicago*, 940 F.2d 233, 238 (7th Cir. 1991)). "Deliberate indifference does not encompass negligence, or even gross negligence, as those terms are used in the context of tort cases." *Id*. (citing *Shockley v. Jones*, 823 F.2d 1068, 1072 (7th Cir. 1987)). Instead, the public official must "know[ ] of and disregard[ ] an excessive risk to . . . health or safety[.]'" *Vance v. Peters*, 97 F.3d 987, 992 (7th Cir. 1996) (quoting *Williams v. O'Leary*, 55 F.3d 320, 324 (7th Cir. 1995)). "Deliberate indifference 'implies at a minimum actual knowledge of impending harm easily preventable, so that a conscious, culpable refusal to prevent harm can be

inferred from the defendant's failure to prevent it.'"  *Thomas*, 2006 WL 3360516, at *4 (quoting *Duckworth v. Franzen*, 780 F.2d 645, 653 (7th Cir. 1985)).  *See also James v. Milwaukee County*, 956 F.2d 696, 700 (7th Cir. 1992) (stating that "deliberate indifference" means "recklessness in a criminal, subjective sense:  disregarding a risk of danger so substantial that knowledge of the danger can be inferred.") (emphasis omitted).

It may be that the shocks-the-conscience standard and the deliberate indifference standard are functionally the same.  *See Bublitz v. Cottey*, 327 F.3d 485, 490 (7th Cir. 2003) (quoting *Schaefer v. Goch*, 153 F.3d 793, 797 (7th Cir. 1998)) ("Deliberate indifference . . . is merely the manifestation in certain situations of a more general inquiry, which is whether the government conduct at issue . . . shocks the conscience.").  Regardless of which standard applies to Adams's due process claims, nothing in the record shows conduct by Prince and Cahokia sufficient to establish a violation of Adams's substantive due process rights.  The record reflects that Craig Nichols had a fairly extensive disciplinary record, consisting in great part of trivial infractions like disrupting classes by eating in class, whistling in class, and so on, but also including more serious infractions like fighting with other students.  *See* Doc. 66, Ex. B; Doc. 68, Ex. F at 44-46; *Id.*, Exs. I-K; Doc. 78, Ex. C.  However, while it appears from the record that Nichols was not a model student, there also is nothing in the record to suggest that school officials knew or should have known that he was capable of committing a sexual assault on another student.  Both Prince and Cotton testified that, before the alleged assault, they had no specific knowledge of Nichols at all.  *See* Doc. 66, Exs. D-E.  Adams herself testified that, before the incident, Nichols was on friendly terms with her:

> Q.  With regard to Craig Nichols, would you describe you and he as friends before this incident –
> A.  – Yes.
> Q.  – on April 27th?

A.  Yes.
Q.  Had he ever done anything to you before April 27th, '04?
A.  No.
Q.  Had he ever been mean to you?
A.  No.
Q.  Did you have any reason to believe he had a history or tendency to be mean to other people?
A.  No.
Q.  Had he ever physically attacked any of your friends?
A.  No.

* * * *

Q.  Did you ever hear anything – and I'm talking about the time before April 27th of '04 – ever hear anything that anyone said about Craig Nichols that led you to believe that he was like a sexual predator or inclined to attack people physically or sexually?
A.  No.
Q.  As far as you were concerned, up until April 27th of '04, you thought he was a good guy?
A.  Yes.
Q.  Nice guy?
A.  Yes.
Q.  Nonviolent?
A.  Right.
Q.  Not a rapist?
A.  Right.

Doc. 66, Ex. I at 92-93, 94.

In short, the record does not reveal a scintilla of evidence that, before the alleged assault, Prince and Cahokia had any reason to believe that Nichols was a potential rapist.  Moreover, even if school officials had reason to believe Nichols was capable of committing sex offenses, and nothing in the record supports this view, case law suggests that, to impose liability in this instance under 42 U.S.C. § 1983, Adams must show that school officials had knowledge of a specific intention on Nichols's part to harm her.  "In most every circuit court decision imposing § 1983 liability because the State affirmatively created or enhanced a danger [to a student], 'the immediate

threat of harm has a limited range and duration,' unlike the indefinite risk created by enrolling [a student] in public school." *Dorothy J.*, 7 F.3d at 733 n.4 (quoting *Reed v. Gardner*, 986 F.2d 1122, 1127 (7th Cir. 1993)) (holding that allegations that a state agency violated a mentally-retarded student's due process rights by placing the student in a program with a student with a history of sexually violent behavior, with the result that a sexual assault occurred, failed to state a claim under section 1983, as the assault was too remote a consequence of enrolling the violent student in the program two years before the assault). *See also Graham v. Independent Sch. Dist. No. I-89*, 22 F.3d 991, 995 (10th Cir. 1994) (quoting *Martinez v. California*, 444 U.S. 277, 285 (1980)) (in a section 1983 suit against a school district by the mother of a student who was murdered by another student, alleging that the district failed to react to known threats made against her son, holding that school officials did not violate substantive due process: "Notwithstanding defendants' specific knowledge of the propensities of the aggressors, any danger to the victims was 'too remote a consequence of [the defendants'] action to hold them responsible under the federal civil rights law.'").[3]

The record in this case demonstrates at most conduct by school officials that may or may not have been negligent (and most likely was not) and therefore Adams has failed to show a genuine issue of fact as to whether Prince and Cahokia violated her substantive due process rights. Because

---

3. Although as discussed liability under 42 U.S.C. § 1983 is not coextensive with ordinary negligence liability, the Court notes that liability in tort for failure to protect an individual from injury by a third person normally attaches only where there is knowledge of a specific threat to that individual. *See Tarasoff v. Regents of Univ. of Cal.*, 551 P.2d 334, 343, 353 (Cal. 1976) (holding that a psychotherapist was negligent in failing to protect a university student from an assault by a patient where the therapist had knowledge that the patient intended to murder the student). *Cf. Thompson v. County of Alameda*, 614 P.2d 728, 730, 735-38 (Cal. 1980) (holding that a county was not negligent in releasing from custody a juvenile delinquent who was known to have dangerous and violent propensities toward young children and who, within hours after being released, sexually assaulted and murdered the plaintiffs' son where, although the delinquent threatened that, if released, he would kill a child, he identified no specific potential victim).

the Court finds that Prince did not violate Adams's due process rights, it follows that Cahokia cannot be held liable for such a violation.  Moreover, even if there were anything in the record to suggest liability on Prince's part, and there is not, it is plain that the record does not support a finding of municipal liability in this case.  Because the doctrine of respondeat superior does not apply in actions brought under 42 U.S.C. § 1983, a municipal entity may only be held liable for the a constitutional injury that is the direct product of its policy or well-settled custom showing deliberate indifference to those whom the policy or custom affects.  *See Monell*, 436 U.S. at 694.  Adams has not demonstrated the existence of any policy or custom that caused the alleged constitutional injury in this case, and a single incident of a constitutional deprivation is insufficient to meet the *Monell* standard.  *See Ekergren v. City of Chicago*, 538 F. Supp. 770, 773-74 (N.D. Ill. 1982) (unspecific allegations of frequent "illegal arrests" or "illegal searches and seizures" held insufficient to establish a cognizable pattern of misconduct on the basis of which a municipal policy of condoning police misconduct could be inferred); *Rivera v. Farrell*, 538 F. Supp. 291, 293-94 (N.D. Ill. 1982) (a section 1983 plaintiff must show more than the existence of a single wrongful act allegedly perpetrated by governmental employees to establish a claim for relief against a municipality or governmental entity).  *Cf. Starstead v. City of Superior*, 533 F. Supp. 1365, 1368-70 (W.D. Wis. 1982) (allegations that five different plaintiffs were each subjected to attack by the defendants' police dogs on seven different occasions were sufficient to suggest that some form of municipal policy was the motivating force behind the plaintiffs' injuries).  Summary judgment will be granted as to Adams's section 1983 claims for violation of her Fourteenth Amendment substantive due process rights.

### 3.       Fourth Amendment Claims

The Fourth Amendment provides that the people have "[t]he right . . . to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," U.S. Const. amend. IV, which requires generally, of course, a showing of probable cause before law enforcement can search or seize a person or thing.  *See Florida v. Royer*, 460 U.S. 491, 498 (1983).  Adams alleges that Prince, Cotton, Cahokia, Justus, and St. Clair County violated her Fourth Amendment rights by conducting an investigation of the alleged assault on her by Craig Nichols without probable cause on April 28, 2004.  While it is axiomatic that "[s]tudents in the public schools do not 'shed their constitutional rights . . . at the schoolhouse gate,'" *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988) (quoting *Tinker v. Des Moines Indep. Cmty Sch. Dist.*, 393 U.S. 503, 506 (1969)), under the unique standard applicable to Fourth Amendment claims in the public school context, Adams has failed to show a genuine issue for trial as to whether school officials acted reasonably in conducting the investigation of Nichols's alleged assault on her.  Therefore, summary judgment will be granted as to Adams's claims of violation of her Fourth Amendment rights.

In *New Jersey v. T.L.O.*, 469 U.S. 325 (1985), the Court "address[ed] . . . the questions of the proper standard for assessing the legality of searches conducted by public school officials and the application of that standard to the facts of this case." *Id*. at 328.  Before reaching those issues, however, the Court first had to determine whether the Fourth Amendment even applies to searches conducted by public school officials.  *See id*. at 333.  The Court concluded that it does, and further held that the Fourth Amendment's prohibition against unreasonable searches and seizures applies to the states through the Fourteenth Amendment in this context, and that the Fourteenth Amendment protects the rights of students from the unlawful actions of public school officials.

*See id.* at 334-37.  The Court specifically rejected the argument that because "[t]eachers and school administrators . . . act *in loco parentis* . . . their authority is . . . not subject to the limits of the Fourth Amendment."  *Id.* at 336 (citing *R.C.M. v. State*, 660 S.W.2d 552 (Tex. App. 1983)).

Importantly, although the *T.L.O.* Court found that the Fourth Amendment applies to searches of students by school officials, the Court placed significant qualifications on the right.  To determine what Fourth Amendment standard school officials must meet to search students lawfully, the Court weighed the students' privacy interests against "the substantial interest of teachers and administrators in maintaining discipline in the classroom and on school grounds."  469 U.S. at 339.  The Court found that the unique public school setting called for relaxation of the search standards to which public authorities normally are subject.  Accordingly, the Court deemed the Fourth Amendment's warrant requirement "unsuited to the school environment."  *Id.* at 340.  Further, the Court held that probable cause is not an "irreducible requirement" of a legal search.  *Id.*  Rather, the Court explained, the core of the Fourth Amendment requires that searches be reasonable.  Accordingly, the Court balanced the privacy interests of students with the need for school officials to maintain order, and held that searches conducted by these officials need not be based on probable cause; rather, the searches must depend only "on the reasonableness, under all the circumstances, of the search."  *Id.* at 341.  The Court went on to set out a two-part test for evaluating the reasonableness of a search of a student by a school official.  First, the search must have been "justified at its inception."  *Id.* (quoting *Terry v. Ohio*, 392 U.S. 1, 20 (1968)).  Second, the search must have been "reasonably related in scope to the circumstances which justified [it] in the first place."  *Id.*  The Court applied this test to declare a school official's search of a student reasonable for Fourth Amendment purposes.  *See id.* at 344-48.

In *Vernonia School District*, in which the Court addressed the constitutionality of random, suspicionless drug testing of student athletes by a public school, the Court, relying on its earlier decision in *T.L.O.*, outlined four factors to consider in determining the reasonableness of a search by balancing a student's Fourth Amendment interests against a school's legitimate governmental interests. Those factors are: (1) "the nature of the privacy interest upon which the search . . . at issue intrudes," 515 U.S. at 654; (2) "the character of the intrusion that is complained of," *id.* at 658; (3) "the nature and immediacy of the governmental concern," *id.* at 660; and (4) "the efficacy of th[e] means for addressing the [governmental concern]." *Id.* at 663. Applying the foregoing factors, the *Vernonia* Court determined that the searches at issue were reasonable for Fourth Amendment purposes. Concerning the nature of the privacy interest upon which the searches intruded, the Court observed that public school students have a significantly lower expectation of privacy than other citizens:

> Fourth Amendment rights, no less than First and Fourteenth Amendment rights, are different in public schools than elsewhere; the "reasonableness" inquiry cannot disregard the schools' custodial and tutelary responsibility for children. For their own good and that of their classmates, public school children are routinely required to submit to various physical examinations, and to be vaccinated against various diseases . . . . Particularly with regard to medical examinations and procedures, therefore, "students within the school environment have a lesser expectation of privacy than members of the population generally."

*Id.* at 656-57 (quoting *T.L.O.*, 469 U.S. at 348). The Court observed that, with regard to student athletes in particular, "[b]y choosing to 'go out for the team,' they voluntarily subject themselves to a degree of regulation even higher than that imposed on students generally . . . . Somewhat like adults who choose to participate in a 'closely regulated industry,' students who voluntarily participate in school athletics have reason to expect intrusions upon normal rights and privileges, including privacy." *Id.* at 657. The *Vernonia* Court found further that the searches were not

excessively intrusive. "Under the District's Policy, male students produce samples at a urinal along a wall. They remain fully clothed and are only observed from behind, if at all. Female students produce samples in an enclosed stall, with a female monitor standing outside listening only for sounds of tampering. These conditions are nearly identical to those typically encountered in public restrooms, which men, women, and especially schoolchildren use daily." *Id*. at 658. "Under such conditions, the privacy interests compromised by the process of obtaining the urine sample are in our view negligible." *Id*. The Court noted also that the samples were collected for the purpose of determining eligibility to participate in student athletics, not law enforcement. *See id*.

With respect to the governmental interest at issue, the Court recognized that schools have a strong interest in combating drug use by students, especially athletes, and that random urinalysis tests are an effective means of protecting that interest. "That the nature of the concern is important – indeed, perhaps compelling – can hardly be doubted. Deterring drug use by our Nation's schoolchildren is at least as important as enhancing efficient enforcement of the Nation's laws against the importation of drugs[.]" 515 U.S. at 661. "School years are the time when the physical, psychological, and addictive effects of drugs are most severe . . . . And of course the effects of a drug-infested school are visited not just upon the users, but upon the entire student body and faculty, as the educational process is disrupted." *Id*. at 661-62. "In the present case, moreover, the necessity for the State to act is magnified by the fact that this evil is being visited not just upon individuals at large, but upon children for whom it has undertaken a special responsibility of care and direction." *Id*. at 662. Finally, the Court concluded that the means selected by the school to enforce its interest in preventing drug use was effective. "As to the efficacy of this means for addressing the problem: It seems to us self-evident that a drug problem largely fueled by the 'role

model' effect of athletes' drug use, and of particular danger to athletes, is effectively addressed by making sure that athletes do not use drugs." *Id*. at 663. The Court specifically rejected the alternative view proposed by the respondents that drug testing should be premised on suspicion of drug use as "a less intrusive means to the same end":

> We have repeatedly refused to declare that only the . . . least intrusive . . . search practicable can be reasonable under the Fourth Amendment . . . . Respondents' alternative entails substantial difficulties – if it is indeed practicable at all. It may be impracticable, for one thing, simply because the parents who are willing to accept random drug testing for athletes are not willing to accept accusatory drug testing for all students, which transforms the process into a badge of shame. Respondents' proposal brings the risk that teachers will impose testing arbitrarily upon troublesome but not drug-likely students. It generates the expense of defending lawsuits that charge such arbitrary imposition, or that simply demand greater process before accusatory drug testing is imposed. And not least of all, it adds to the ever-expanding diversionary duties of schoolteachers the new function of spotting and bringing to account drug abuse, a task for which they are ill prepared, and which is not readily compatible with their vocation . . . . In many respects, we think, testing based on . . . suspicion . . . of drug use would not be better, but worse.

*Id*. at 663-64. Thus, because of "the decreased expectation of privacy, the relative unobtrusiveness of the search, and the severity of the need met by the search," the Court determined that the searches at issue were reasonable for Fourth Amendment purposes. *Id*. at 664-65.

Adams argues that because Cotton is a St. Clair County Sheriff's Department deputy the search in this case is governed not by the reasonableness standard enunciated in *T.L.O.* and *Vernonia* but by the higher probable cause standard. The Court does not agree. Cotton, as a school resource officer, is a school employee and, as in this case, undertakes investigations of disciplinary infractions by students on school grounds solely at the request of school authorities. *See* Doc. 64, Ex. B at 24-25, 61, 63; Doc. 68, Ex. B at 56. Although the Seventh Circuit Court of Appeals has not spoken to the issue, the weight of authority holds, and the Court agrees, that a search of a student on school grounds by a school resource officer at the request of school officials should be deemed

a search by a school employee for Fourth Amendment purposes and thus is subject to the reasonableness standard, not the probable cause standard. *See, e.g., In re William V.*, 4 Cal. Rptr. 3d 695, 699-700 (Cal. Ct. App. 2003) (a police officer on assignment to a school as a resource officer was a "school official" for purposes of the Fourth Amendment, and thus his search of a student was analyzed under the *T.L.O.* reasonableness standard); *State v. N.G.B.*, 806 So. 2d 567, 568-69 (Fla. Dist. Ct. App. 2002) (reasonableness, not probable cause, was the appropriate standard by which to assess the legality of a search of a student by a school resource officer, where the investigation was initiated by the school's vice principal who enlisted the officer's assistance); *State v. Whorley*, 720 So. 2d 282, 283 (Fla. Dist. Ct. App. 1998) (a search of a student by a school resource officer must be justified at its inception, and the search must be reasonably related in scope to the reason for the search); *People v. Dilworth*, 661 N.E.2d 310, 317 (Ill. 1996) (the reasonableness standard, not the probable cause standard, applied to determine whether a police liaison officer, who was a staff member at an alternative school for students with behavioral disorders, violated a student's Fourth Amendment rights by searching a flashlight possessed by the student, who was suspected of involvement with drugs); *In re Josue T.*, 989 P.2d 431, 436-37 (N.M. Ct. App. 1999) (applying the reasonableness standard where a school resource officer conducted a search of a student at the request of a school official); *In re Angelia D.B.*, 564 N.W.2d 682, 687 (Wis. 1997) (citing *Cason v. Cook*, 810 F.2d 188, 191-92 (8th Cir. 1987)) (the reasonableness standard, not the probable cause standard, applied to a search conducted by a school liaison officer, at the request of and in conjunction with school officials, of a student reasonably suspected of carrying a dangerous weapon on school grounds; the officer became involved in the investigation only after school officials requested his assistance, and, throughout the course of the investigation, he acted in

Page 20 of  32

conjunction with school officials on school grounds).

Turning then to the search at issue in this case, the Court discerns no genuine issue of fact as to the reasonableness of the search.  The search obviously was justified at its inception, as Adams had reported to Prince that she had been sexually assaulted by another student, an incident which clearly demanded prompt investigation by school officials.  Further, the record demonstrates that the search was reasonably related in scope to the reason for the search, in light of the factors outlined in *Vernonia*.  With respect to the privacy interest at issue, as discussed, Adams as a public school student has a reduced expectation of privacy.  Nor does the search appear to have been unduly intrusive.  Although it is not entirely clear from the record how long the interview between Adams and Cotton lasted, it appears to have been something less than an hour, including a brief physical examination of Adams by a female school employee. *See* Doc. 64, Ex. A at 87-89.  Adams testified that she was treated courteously by Cotton:

    Q.  Did Deputy Cotton ever touch you on April 28th, '04?
    A.  Touch me as in –?
    Q.  Lay a hand on you?
    A.  As in like shaking my hand?
    Q.  That would qualify.  Did he shake your hand?
    A.  Yeah, he always shake my hand.
    Q.  Other than shaking your hand, did he touch you in any way?
    A.  No.
    Q.  Did he do anything to you that you felt wow, this is inappropriate.
    A.  No.
    Q.  Did he treat you in a nice manner?
    A.  Yes.
    Q.  Did he try to intimidate you?
    A.  No.
    Q.  Did he yell at you?

    * * * *

    A.  He never did nothing like that.
    Q.  Never ever?

A.  No.

Doc. 64, Ex. A at 96-97.  Adams testified also that she was aware during the interview that she was

not under suspicion of any disciplinary infraction or criminal wrongdoing.  *See id*. at 106.  As for

the physical examination of Adams, it appears that a female school employee, Dr. Gladu, briefly

inspected Adams's arms and back for scratches and other marks caused by the alleged assault.  *See*

Doc. 66, Ex. N; Doc. 68, Ex. A at 82-83.  Adams never disrobed, and the examination lasted less

than five minutes.  *See* Doc. 68, Ex. A at 86.

The school's interest in conducting a prompt investigation of a sexual assault on one student

by another student obviously was very great, even overwhelming.  Such an event is highly disruptive

of the "educational process" and, correspondingly, a school's "custodial and tutelary responsibility"

for the children in its care.  *Vernonia*, 515 U.S. at 662, 656.  Too, had Craig Nichols committed a

second assault on a classmate while school officials dithered, both the disruption of the school's

educational mission and, potentially, the school's civil liability would have been enormous.  Lastly,

the means employed by the school to protect its interest plainly are efficacious.  It is difficult to

imagine how the school could have conducted an effective investigation of the alleged assault other

than through a short interview with Adams.  Although Adams insists that the investigation should

not have been conducted without her mother present, the Court disagrees.  Nothing in the language

of *T.L.O.* or *Vernonia* suggests that a parent's consent is germane to the reasonableness of a search

of a student by school officials and in fact, as discussed, in *Vernonia* the Court specifically declined

to adopt a standard that would have tied reasonableness to a parent's consent to such a search.  *See*

515 U.S. at 663-64.  It is very easy to imagine circumstances in which parents might have strong

incentives to withhold consent to reasonable searches of students by school officials.  *See*

*Puricelli v. Houston*, No. CIV. A. 99-2982, 2000 WL 760522, at *9 (E.D. Pa. June 12, 2000) (school officials' questioning of a student whom they suspected was a victim of child abuse was subject to the reasonableness standard, not the probable cause standard); *Picarella v. Terrizzi*, 893 F. Supp. 1292, 1297 (M.D. Penn. 1995) (same). *See also Coleman v. State of N.J. Div. of Youth & Family Servs.*, 246 F. Supp. 2d 384, 392-93 (D.N.J. 2003). In the particular context of a sexual assault on a student by another student, it is quite possible that a parent whose child had been assaulted might wish to withhold consent to an investigation of such an incident out of concern that the investigation might cause emotional trauma for the child or result in stigma, as sometimes attaches, unfortunately, to victims of sexual assault. The Court is sympathetic to these concerns, but it is plain that they carry little weight as against a school's compelling need promptly to investigate incidents of student-on-student violence. *See T.L.O.*, 469 U.S. at 339 (noting that, to preserve a school's "proper educational environment," school officials must have the ability to take "immediate, effective action").

In sum, the record shows no genuine issue of fact as to Adams's claims under 42 U.S.C. § 1983 for violations of her Fourth Amendment rights. Because the Court concludes that no violation of Adams's Fourth Amendment rights occurred, it follows that Prince and Cotton cannot be held liable for conspiring to violate those rights. Having concluded that no Fourth Amendment violation occurred, the Court need not reach the merits of the claims of qualified immunity raised by Prince, Cotton, Cahokia, Justus, and St. Clair County, although were the Court to resolve the issue on its merits, it likely would conclude that qualified immunity bars Adams's Fourth Amendment claims. "In general . . . a government officer is entitled to qualified immunity if a reasonable officer could have believed that his or her conduct was constitutional in light of the

clearly established law and the information the officer possessed at the time an alleged deprivation of constitutional rights occurred." *Thomas*, 2006 WL 3360516, at *8. Correspondingly, where the existence of a constitutional right depends upon a balancing of factors, as Adams's Fourth Amendment claims do, it rarely is possible to hold that the right is clearly established for purposes of qualified immunity. *See Benson v. Allphin*, 786 F.2d 268, 276 (7th Cir. 1986) (noting that "whenever a balancing of interests is required," a constitutional right normally is not clearly established). *See also Borucki v. Ryan*, 827 F.2d 836, 848 (1st Cir. 1987) ("[W]hen the law requires a balancing of competing interests, . . . it may be unfair to charge an official with knowledge of the law in the absence of a previously decided case with clearly analogous facts."); *Myers v. Morris*, 810 F.2d 1437, 1462 (8th Cir. 1987) ("[I]f the existence of a right or the degree of protection it warrants in a particular context is subject to a balancing test, the right can rarely be considered 'clearly established,' at least in the absence of closely corresponding factual and legal precedent."). Summary judgment will be granted as to Adams's section 1983 claims for violations of her Fourth Amendment rights.[4]

## B.    Motions for Reconsideration

As a final matter, the Court addresses Adams's motions for reconsideration of the Court's Order dismissing her claims for false imprisonment. District courts have inherent power to reconsider interlocutory orders. *See Peterson v. Lindner*, 765 F.2d 698, 704 (7th Cir. 1985) ( "Of course, if the order was interlocutory, [the district judge] had the power to reconsider it at any time

---

4.    Because the Court has concluded that Cotton was acting as a school employee, not a police officer, Justus and St. Clair County cannot be liable, of course, on Adams's Fourth Amendment claims. Also, as with Adams's Fourteenth Amendment claims, her failure to point to a pattern of unlawful searches and seizures by state actors dooms any municipal liability under the *Monell* standard.

before final judgment." ); *Koelling v. Livesay*, No. 04-CV-00375-MJR, 2006 WL 3360502, at *1 (S.D. Ill. July 27, 2006) (citing *A. Hollow Metal Warehouse, Inc. v. U.S. Fidelity & Guar. Co.*, 700 F. Supp. 410, 411-12 (N.D. Ill. 1988)) ("[R]econsideration of interlocutory orders is a matter of a district court's inherent power[.]"); *Fisher v. National R.R. Passenger Corp.*, 152 F.R.D. 145, 149 (S.D. Ind. 1993) (citing *Marconi Wireless Tel. Co. of Am. v. United States*, 320 U.S. 1, 47-48 (1943)) ("[I]t is well-established that a district court has the inherent power to reconsider interlocutory orders and re-open any part of a case before entry of final judgment."). Reconsideration of an interlocutory order is committed to a court's sound discretion. *See* FED. R. CIV. P. 54(b) (absent entry of a final judgment, any "order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties."); *Fisher*, 152 F.R.D. at 149 (noting the "practically unbridled discretion of a district court to reconsider a previous interlocutory order."). *See also Fayetteville Investors v. Commercial Builders, Inc.*, 936 F.2d 1462, 1469 (4th Cir. 1991) ("An interlocutory order is subject to reconsideration at any time prior to the entry of final judgment.").

A motion to reconsider is appropriate where: the court has misunderstood a party; the court has made a decision outside the adversarial issues presented to the court by the parties; the court has made an error of apprehension (not of reasoning); a significant change in the law has occurred; or significant new facts have been discovered. *See Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191 (7th Cir. 1990); *SEC v. National Presto Indus., Inc.*, No. 02 C 5027, 2004 WL 1093390, at *2 (N.D. Ill. Apr. 28, 2004); *Neal v. Honeywell, Inc.*, No. 93-1143, 1996 WL 627616, at *3 (N.D. Ill. Oct. 25, 1996); *Young v. Murphy*, 161 F.R.D. 61, 62 (N.D. Ill. 1995). *See also Ahmed v. Ashcroft*, 388 F.3d 247, 249 (7th Cir. 2004) ("Such a motion [for reconsideration]

is a request that the [court] reexamine its decision in light of additional legal arguments, a change of law, or perhaps an argument or aspect of the case which was overlooked.").  "[M]otions for reconsideration serve a limited function:  to correct manifest errors of law or fact or to present newly discovered  evidence." *Zurich Capital Mkts. Inc. v. Coglianese*, 383 F. Supp. 2d 1041, 1045 (N.D. Ill. 2005) (quoting *Publishers Res., Inc. v. Walker-Davis Publ'ns, Inc.*, 762 F.2d 557, 561 (7th Cir. 1985)).  *See also Caisse Nationale de Credit Agricole v. CBI Indus., Inc.*, 90 F.3d 1264, 1269 (7th Cir. 1996).  Further, "[m]otions for reconsideration . . . generally are not encouraged." *Automatic Liquid Packaging, Inc. v. Dominik*, No. 86 C 5595, 1987 WL 26149, at *1 (N.D. Ill. Dec. 2, 1987).  Rather, such motions should be brought and reviewed with the understanding that "[t]he Court's prior rulings . . . are not intended as mere first drafts, subject to revision and reconsideration at a litigant's pleasure," and that "ill-founded requests for reconsideration of issues previously decided . . . needlessly take the court's attention from current matters and visit inequity upon opponents who, prevailing in an earlier proceeding, must nevertheless defend their position again and again." *Berger v. Xerox Ret. Income Guar. Plan*, 231 F. Supp. 2d 804, 820 (S.D. Ill. 2002).

In this instance Adams's request for reconsideration is based on testimony from depositions of Adams and Wilson taken after the Order as to which reconsideration is sought was entered.  Adams does not explain, and the Court cannot fathom, why the facts as to which she and Wilson testified at their depositions were not known to them before the Order was entered or why those facts could not have been submitted to the Court via affidavits while the motion to dismiss Adams's false

imprisonment claims was sub judice.[5]  The facts testified to by Adams and Wilson at their depositions clearly do not constitute newly-discovered evidence and therefore are not a proper foundation for a request for reconsideration.  A motion for reconsideration "cannot in any case be employed as a vehicle to introduce new evidence that could have been adduced during pendency of the [underlying] motion."  *Drnek v. City of Chicago*, 205 F. Supp. 2d 894, 895-96 (N.D. Ill. 2002) (quoting *Rothwell Cotton Co. v. Rosenthal & Co.*, 827 F.2d 246, 251 (7th Cir. 1987)).  *See also In re Sulfuric Acid Antitrust Litig.*, 446 F. Supp. 2d 910, 920-21 (N.D. Ill. 2006); *Caraker v. Sandoz Pharms. Corp.*, 172 F. Supp. 2d 1018, 1024 (S.D. Ill. 2001); *Jefferson v. Security Pac. Fin. Servs., Inc.*, 162 F.R.D. 123, 124-25 (N.D. Ill. 1995); *Refrigeration Sales Co. v. Mitchell-Jackson, Inc.*, 605 F. Supp. 6, 8 (N.D. Ill. 1983).  As the Seventh Circuit Court of Appeals has explained, "It is not the purpose of allowing motions for reconsideration to enable a party to complete presenting his case after the court has ruled against him.  Were such a procedure to be countenanced, some lawsuits really might never end, rather than just seeming endless."  *Frietsch v. Refco, Inc.*, 56 F.3d 825, 828 (7th Cir. 1995).

More fundamentally, however, Adams's request for reconsideration simply ignores the central point of the Court's prior Order.  As the Supreme Court recognized in *Vernonia*, the common-law doctrine of in loco parentis largely shields schools from liability to students for common-law torts:

> Traditionally at common law, and still today, unemancipated minors lack some of
> the most fundamental rights of self-determination – including even the right of

---

5.   Naturally, consideration of matters outside the pleadings in evaluating a motion to dismiss for failure to state a claim upon which relief can be granted likely would have required the Court to convert the motion to dismiss to a motion for summary judgment.  *See* FED. R. CIV. P. 12(b); *Donaldson v. Pharmacia Pension Plan*, 435 F. Supp. 2d 853, 860 n.2 (S.D. Ill. 2006).

> liberty in its narrow sense, i.e., the right to come and go at will.  They are subject, even as to their physical freedom, to the control of their parents or guardians . . . . When parents place minor children in private schools for their education, the teachers and administrators of those schools stand *in loco parentis* over the children entrusted to them.  In fact, the tutor or schoolmaster is the very prototype of that status.  As Blackstone describes it, a parent "may . . . delegate part of his parental authority, during his life, to the tutor or schoolmaster of his child; who is then *in loco parentis*, and has such a portion of the power of the parent committed to his charge, viz. that of restraint and correction, as may be necessary to answer the purposes for which he is employed."

515 U.S. at 654-55 (quoting 1 William Blackstone, *Commentaries on the Laws of England* 441 (1769)).  Consistent with *Vernonia*, the Court held in its Order dismissing Adams's false imprisonment claims that, in light of the in loco parentis doctrine, students generally do not "possess[ ] freedom of movement within the school.  'School personnel possess power over students, and school personnel are permitted a degree of supervision and control that cannot be exercised over free adults.'"  *Wilson v. Cahokia Sch. Dist. #187*, No. Civ. 05-297-GPM, 2005 WL 2407577, at *2 (S.D. Ill. Sept. 29, 2005) (quoting *Bell v. Marseilles Elementary Sch.*, No. 00-2553, 2001 WL 818897, at *5 n.6 (N.D. Ill. Mar. 7, 2001)).

Importantly, the Illinois School Code codifies the in loco parentis doctrine, providing generally that

> teachers, other certificated educational employees, and any other person, whether or not a certificated employee, providing a related service for or with respect to a student shall maintain discipline in the schools, including school grounds which are owned or leased by the board and used for school purposes and activities.  In all matters relating to the discipline in and conduct of the schools and the school children, they stand in the relation of parents and guardians to the pupils.

105 ILCS 5/24-24.  *See also Doe v. Chicago Bd. of Educ.*, 791 N.E.2d 1283, 1288 (Ill. App. Ct. 2003) (under the Illinois School Code, educators are immunized from acts involving ordinary negligence, but not from acts involving willful and wanton misconduct); *Brugger v. Joseph Acad.*,

*Inc.*, 760 N.E.2d 135, 139 (Ill. App. Ct. 2001) (same); *Nielsen v. Community Unit Sch. Dist. No. 3*, 412 N.E.2d 1177, 1178 (Ill. App. Ct. 1980) (same).   *Cf. Mroczynski v. McGrath*, 216 N.E.2d 137, 139 (Ill. 1966) ("Under the common law, a child could not maintain an action against his or her parents sounding in tort," save in cases involving "willful misconduct" by a parent against a child). Adams argues that because Wilson spoke with Cotton by telephone while he was interviewing Adams, the statutory immunity does not apply, citing a provision of 105 ILCS 5/24-24 which states that the in loco parentis "relationship shall extend to all activities connected with the school program, including all athletic and extracurricular programs, and may be exercised at any time for the safety and supervision of the pupils in the absence of their parents or guardians."   105 ILCS 5/24-24.  The Court does not agree.  First, just as a motion for reconsideration is not a vehicle for tendering evidence that could have been presented earlier, so too it is not a vehicle for advancing new legal theories.  *See Fahy v. Page*, No. 01 C 7532, 2004 WL 1093376, at *2 (N.D. Ill. May 7, 2004); *Bachman v. Bear, Stearns & Co., Inc.*, 57 F. Supp. 2d 556, 564 (N.D. Ill. 1999); *Holmes v. City of Aurora*, No. 93 C 0835, 1995 WL 21606, at *3 (N.D. Ill. Jan. 18, 1995).  Second, Adams is simply wrong.  The purpose of the statutory provision upon which she relies is to extend the in loco parentis immunity to school officials acting in non-disciplinary settings, like extracurricular activities, not to limit the immunity in situations where, as in this case, school officials were performing functions related to school discipline.  *See Kobylanski v. Chicago Bd. of Educ.*, 347 N.E.2d 705, 708-09 (Ill. 1976); *Plesnicar v. Kovach*, 430 N.E.2d 648, 651 (Ill. App. Ct. 1981); *Nielsen*, 412 N.E.2d at 1178.  Thus, the immunity applies in this case.

Finally, the Court notes that, having had the opportunity to review the record in this case on summary judgment, there simply is no evidence creating an issue for trial as to Adams's false

imprisonment claims.  Under Illinois law the common-law tort of false imprisonment is defined as "an unreasonable restraint of an individual's liberty, against his will, caused or procured by the defendant." *Meerbrey v. Marshall Field & Co.*, 564 N.E.2d 1222, 1231 (Ill. 1990).  "[T]he evidence must establish a restraint against the plaintiff's will, as where she yields to force, to the threat of force or the assertion of authority." *Lopez v. Winchell's Donut House*, 466 N.E.2d 1309, 1312 (Ill. App. Ct. 1984).  Actual force is unnecessary to an action for false imprisonment; unlawful restraint may be effected by words alone, by acts alone, or by both.  *See Marcus v. Liebman*, 375 N.E.2d 486, 488 (Ill. App. Ct. 1978).  An actor may bring about the confinement required as an element of false imprisonment in various ways, including:  (1) actual or apparent physical barriers; (2) overpowering physical force, or by submission to physical force; (3) threats of physical force; (4) other duress; and (5) asserted legal authority.  *See Lopez*, 466 N.E.2d at 1312 (citing Restatement (Second) of Torts §§ 38-41 (1965)).

In the present case, there is nothing in the record to suggest that Adams was confined against her will.  As has already been discussed, Adams testified that at the time she was interviewed by Cotton she knew that she was under no suspicion of wrongdoing and that Cotton never threatened or coerced her.  There is no evidence in the record that Adams asked to leave or that Cotton told her she could not leave.  In fact, the record indicates that Adams's presence at the interview was wholly voluntary but, whether it was or not, in the absence of any proof of an unlawful restraint no reasonable jury could find for her on her claims of false imprisonment.  *See Schroeder v. Lufthansa German Airlines*, 875 F.2d 613, 621-22 (7th Cir. 1989) (applying Illinois law) ("The fact that Schroeder felt 'compelled' to stay in the cockpit is not by itself unlawful restraint; she must present facts indicating that she submitted to a threat, express or implied, or yielded to physical force.");

*Robinson v. Sabis Educ. Sys., Inc.*, No. 98 C 4251, 1999 WL 414262, at *16 (N.D. Ill. June 4, 1999) (applying Illinois law) (where a plaintiff "voluntarily, if unhappily, submit[s]" to a request for confinement unaccompanied by unlawful acts or threats, she cannot maintain a claim for false imprisonment); *Hanna v. Marshall Field & Co.*, 665 N.E.2d 343, 349-50 (Ill. App. Ct. 1996) (an employee who was questioned by her supervisor about falsifying time records and receiving pay for time not worked could not maintain a claim for false imprisonment against her employer where she voluntarily responded to a request to come to her supervisor's office and was never threatened with the loss of her job, the questioning occurred during regular business hours, the door to the supervisor's office was not locked, and the employee had access to a telephone); *Lopez*, 466 N.E.2d at 1312 ("In the tort of false imprisonment, it is not enough for the plaintiff to have felt 'compelled' to remain" in a place, absent evidence of a restraint against the plaintiff's will). *See also Vaughn v. Wal-Mart Stores, Inc.*, 734 So. 2d 156, 161-62 (La. Ct. App. 1999) (a child was not falsely imprisoned by a store manager during an investigation of a shoplifting incident where the child was not told that she could not leave the store and was not touched or threatened in any way); *Thomas v. Schwegmann Giant Supermarket, Inc.*, 561 So. 2d 992, 996 (La. Ct. App. 1990) (children who were not under suspicion of shoplifting were not falsely imprisoned by virtue of being in the custody of their grandmother while she was detained by store personnel on suspicion of theft); *Childers v. A.S.*, 909 S.W.2d 282, 293 (Tex. App. 1995) (a child was not falsely imprisoned by another child, who allegedly touched her sexually, where the plaintiff testified that the defendant never stopped her from leaving or held her back).  In sum, the Court finds no grounds to reinstate Adams's false imprisonment claims, and therefore Adams's request for reconsideration of the Court's prior Order dismissing those claims will be denied.

Page 31 of 32

<u>CONCLUSION</u>

The motion for summary judgment brought by Justus and St. Clair County (Doc. 63) and the

motion for summary judgment brought by Cahokia, Prince, and Cotton (Doc. 65) are **GRANTED**.

Adams's motions for reconsideration (Doc. 70, Doc. 71) are **DENIED**.  This action is **DISMISSED**

**with prejudice**.  Judgment will be entered accordingly.

**IT IS SO ORDERED.**

DATED:  1/19/2007


s/ *G. Patrick Murphy*
G. PATRICK MURPHY
Chief United States District Judge